Anthony M. Barnes (Bar No. 199048)
Email: amb@atalawgroup.com
Kenya Rothstein (Bar No. 340854)
Email: ksr@atalawgroup.com
AQUA TERRA AERIS LAW GROUP
8 Rio Vista Ave.
Oakland, CA 94611
Telephone: 917-371-8293

Erina Kwon (Bar No. 235079)
Email: erina@lawaterkeeper.org
Benjamin A. Harris (Bar No. 313193)
Email: ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E. 2nd Street Suite 250
Los Angeles, CA 90012
Telephone: (310) 394-6162

*Attorneys for Plaintiff*
LOS ANGELES WATERKEEPER

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California non-profit association,<br><br>Plaintiff,<br><br>v.<br><br>SUNLAND CHEMICAL & RESEARCH CORP., a California corporation; A. G. LAYNE, INC., a California corporation,<br><br>Defendants. | Case No.: 2:26-CV-9208<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff"), by and through its counsel, hereby alleges the following upon information and belief:

## I. JURISDICTION AND VENUE

1. This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. ("Clean Water Act" or "CWA"). (See 33 U.S.C. § 1365.) This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2. Pursuant to 40 C.F.R. § 135.2(a)(2), on June 15, 2026, LA Waterkeeper issued a 60-day notice letter (the "Notice Letter") to Defendants Sunland Chemical & Research Corp. ("Sunland Chemical") and A. G. Layne, Inc. ("A. G. Layne") (Collectively, "Defendants") as the owners and operators of the Facility located at 5447 San Fernando Road West, Los Angeles, CA 90039, Waste Discharger Identification Number 4 19I000812 (the "Facility"). Plaintiff issued the Notice Letter to Sunland's and A. G. Layne's Chief Executive Officers, Vice President & General Manager, and Registered Agents, as the responsible owners, officers, and/or operators of the Facility.[1]

3. The Notice Letter was also sent to the U.S. Attorney General, Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Los Angeles Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as Exhibit A and is fully incorporated herein by reference.

[1] The Facility is fully described in Section V below.

4. The Notice Letter informed Defendants of their ongoing violations of substantive and procedural requirements of the CWA, 33 U.S.C. § 1251 et seq. and California's General Industrial Storm Water Permit, National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001 Water Quality Order No. 2014-0057-DWQ as amended by Order No. 2015-0122-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) Total Maximum Daily Load ("TMDL") Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use, and as subsequently amended by Order No. 2018-0028-DWQ incorporating TMDL effluent limits (effective July 1, 2020) (hereafter the "Storm Water Permit" or "General Permit") and the Clean Water Act at the Facility.

5. The Notice Letter informed Defendants of Plaintiff's intent to file suit against Defendants to enforce the Storm Water Permit and the Clean Water Act.

6. More than sixty (60) days have passed since both the Notice Letter was served on the Defendants and the State and Federal agencies. Plaintiff is informed and believes, and in turn alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. See 33 U.S.C. § 1365(b)(1)(B).

7. This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

8. Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

9. Plaintiff seeks relief for Defendants' substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

## II. INTRODUCTION

10. With every significant rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility referenced herein, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and river environments each year. These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

11. Heavy metals, including copper, zinc, and lead that accumulate in lakes, oceans, rivers and streams threaten the environment and can instigate health problems and genetic changes in aquatic life, birds and other animals dependent on these waterbodies. These metals in water cannot be easily metabolized by aquatic organisms and can become enriched in organs such as the liver and kidney. Studies show that heavy metals can enter aquatic animals through their gills or during feeding and bind with substances in the bodies of wildlife. High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter

predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are absorbed into TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces. Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic, and the solubility of a substance varies as a function of the pH of a solution. A one-whole-unit change in SU represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

12. This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendants' substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendants' operations at the Facility.

13. Plaintiff specifically alleges violations regarding Defendants' monitoring, reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

## III. PARTIES

### A. Los Angeles Waterkeeper

14. LA Waterkeeper is a non-profit 501(c)(3) public benefit corporation organized under the laws of the State of California. LA Waterkeeper maintains an office at 360 E. 2nd Street, Suite 250, Los Angeles, California 90012.

15. LA Waterkeeper's members live and/or recreate in and around Los Angeles. LA Waterkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, LA Waterkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and others.

16. LA Waterkeeper members work, own homes and live in Los Angeles County and use and enjoy the waters near the Facility, including the Los Angeles River Reach 3, downstream Los Angeles River Estuary, Queensway Bay, San Pedro Bay, and the Pacific Ocean (the "Receiving Waters"). LA Waterkeeper members also use and enjoy the bordering parks, beaches, shorelines, pathways, golf courses, and athletic fields. They enjoy and use other connected waterways to bike, boat, kayak, bird watch, ride horses, view wildlife, hike, walk, run, fish, surf, swim, sail, and recreate. LA Waterkeeper members engage in scientific study through pollution and habitat monitoring and restoration activities in and along all these waters.

17. The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous. Thus, the interests Plaintiff's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Storm Water Permit and the Clean Water Act.

18. Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

19. The interests of LA Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act and the Storm Water Permit. The relief sought herein will redress the harm to Plaintiff caused by Defendants' activities.

**B. The Owners and/or Operators of the Facility**

20. Plaintiff is informed and believes, and thereon alleges, that Sunland Chemical & Research Corp. and A. G. Layne, Inc. were formed in California and are currently registered in California.

21. Plaintiff is informed and believes, and thereon alleges, that Defendants operate an industrial facility and maintains its principal place of business at 5447 San Fernando Road West, Los Angeles, CA 90039.

22. Plaintiff is informed and believes, and thereon alleges, that Defendants are owners and operators of the Facility.

23. Plaintiff is informed and believes, and thereon alleges, that the name and address of the Agent for Service for Sunland Chemical is Michael R. Lee, 5447 San Fernando Road West, Los Angeles, CA 90039 and that the name and address of the Agent for Service for A. G. Layne is Kyle D. Lee, 4578 Brazil Street, Los Angeles, CA 90039.

24. Plaintiff is informed and believes, and thereon alleges, that the Chief Executive Officer of both Sunland Chemical and A. G. Layne is Michael R. Lee.

25. Plaintiff is informed and believes, and thereon alleges, that the Vice President & General Manager of both Sunland Chemical and A. G. Layne is Steven Cooper.

26. LA Waterkeeper refers to Defendants, and its management, as listed in Exhibit A, as the "Owners/Operators" of the Facility.

## IV. STATUTORY BACKGROUND

**A. The Clean Water Act**

27. Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a

National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

28. Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342.

29. Section 301(b) of the Clean Water Act requires that all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. See 33 U.S.C. § 1311(b).

30. The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. §§ 1311(a), 1342.; see 40 C.F.R. § 122.26(c)(1).

31. The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); see 40 C.F.R. § 122.2.

32. The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); see 40 C.F.R. § 122.2.

33. The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation,

or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); see 40 C.F.R. § 122.2.

34. "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7); 33 CFR § 328.3.

35. Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." See 33 U.S.C. §§ 1365(a)(1) and 1365(f).

36. The Defendant is a "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

37. An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

38. Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4), each separate violation of the CWA occurring after November 2, 2015, where penalties are assessed on or after December 27, 2025, commencing five (5) years prior to the date of Notice of Violation and Intent to File Suit subjects each Defendant to a penalty of up to $68,445.00 per day per violation.

39. Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B. California's Storm Water Permit**

40. Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to

dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. See 33 U.S.C. § 1342(b).

41. Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Board and the Regional Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, (2006) 135 Cal. App. 4th 1377, 1380-81. In California, the State Board is charged with regulating pollutants to protect California's water resources. See Cal. Water Code § 13001. The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R. § 123.25. Violations of the Storm Water Permit are also violations of the CWA. Storm Water Permit, Section XXI(A).

42. Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. 33 U.S.C. § 1313(a). The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. See 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

43. The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

44. On July 1, 2015, the current Storm Water Permit became effective and was issued as NPDES General Permit No. CAS000001 State Water Resources Control Board Water Quality Order No. 2014-0057-DWQ. Storm Water Permit, Section I(A) (Finding 4).

45. On November 6, 2018, the State Board amended the Storm Water Permit with Order No. 2015-0122-DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit Amendment").

46. On July 1, 2020, the State Board subsequently amended the Storm Water Permit with Order No. 2018-0028-DWQ, incorporating TMDL effluent limits ("2020 Permit Amendment").

47. In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms or obtain and comply with an individual NPDES permit. Storm Water Permit, Section I.A (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the Storm Water Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. Storm Water Permit, Section I.A (Finding 17), Section II.B.

### C. The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

48. The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. Storm Water Permit, Discharge Prohibition III(B).

49. Effluent Limitations Section V(A) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand, TSS, oil and grease ("O&G"), pH, and fecal coliform.

50. Discharge Prohibition III(C) of the Storm Water Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

51. Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); Storm Water Permit, Section V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. See Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges from Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

52. The 2015 Multi-Sector Permit parameter Benchmarks, among others, are as follows: TSS—100 mg/L; aluminum—0.75 mg/L; nitrate plus nitrite as nitrogen ("N+N")—0.68 mg/L; ammonia—2.14 mg/L; lead—0.082 mg/L (freshwater)/0.21 mg/L (saltwater); cadmium—0.0021 mg/L (freshwater)/0.04 mg/L (saltwater); cyanide—0.022 mg/L; copper—0.014 mg/L (freshwater)/0.0048 mg/L (saltwater); zinc—0.12 mg/L (freshwater)/0.09 mg/L (saltwater); iron—1.0 mg/L; pH—6.0-9.0 s.u.; biological oxygen demand—30 mg/L; chemical oxygen demand— 120 mg/L; arsenic—0.15 mg/L; magnesium—0.064 mg/L; nickel—0.47 mg/L; selenium—0.005 mg/L; and silver—0.0032 mg/L.[2]

---

[2] The 2015 and 2021 Multi-Sector Permit parameter benchmarks for cadmium, nickel, silver, and zinc are dependent on water hardness where discharged into freshwater. The benchmark value listed herein is based on a hardness of 100 mg/L.

53. The EPA's most recent, 2021 Multi-Sector Permit parameter Benchmarks for the following parameters, among others, are as follows: TSS—100 mg/L; aluminum—1.1 mg/L; N+N—0.68 mg/L; ammonia—2.14 mg/L; lead—0.082 mg/L (freshwater)/0.21 mg/L (saltwater); cadmium—0.0018 mg/L (freshwater)/0.033 mg/L (saltwater); cyanide—0.022 mg/L; copper—0.00519 mg/L (freshwater)/0.0048 mg/L (saltwater); zinc—0.12 mg/L (freshwater)/0.09 mg/L (saltwater); pH—6.0-9.0 s.u.; biological oxygen demand—30 mg/L; chemical oxygen demand—120 mg/L; arsenic—0.15 mg/L; nickel—0.47 mg/L; selenium—0.0031 mg/L; and silver—0.0032 mg/L.

54. The Storm Water Permit contains Numeric Action Levels ("NALs") that generally mirror the 2008 EPA Benchmark Values. See Storm Water Permit, Section I(M)(Finding 62). Annual NALs, not accounting for water hardness, for the following parameters are: TSS—100 mg/L; copper—0.0332 mg/L; zinc—0.26 mg/L; nickel—1.02 mg/L; lead—0.262 mg/L; cyanide—0.022 mg/L; iron—1.0 mg/L; N+N—0.68 mg/L; O&G—15 mg/L; aluminum—0.75 mg/L; biological oxygen demand—30 mg/L; and chemical oxygen demand—120 mg/L. Storm Water Permit, Table 2 at 47. Instantaneous Maximum NALs, for the following parameters are: pH—6.0 – 9.0 s.u.; TSS—400mg/L; O&G—25mg/L. Id.

55. An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter.

56. An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. Stormwater Permit Section XII.A.

57. Receiving Water Limitation Section VI(B) of the Storm Water Permit prohibits storm water discharges from adversely impacting human health or the environment.

58. Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation. Storm Water Permit, Section VI(B).

59. Receiving Water Limitation Section VI(A) of the Storm Water Permit prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

60. Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

61. The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

62. The State Water Quality Control Board, Los Angeles Region, has issued the Water Quality Control Plan for the Los Angeles Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan sets forth water quality objectives for dissolved metals such as aluminum, arsenic, and mercury. Basin Plan, Table 3-8. The Basin Plan states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. Id. at 3-44. The Basin Plan also provides that "Toxic pollutants shall not be present at levels that will bioaccumulate in aquatic life to levels which are harmful to aquatic life or human health." Id. at 3-29.

63. The Basin Plan's WQS also requires a narrower pH range of 6.5 – 8.5 pH units for inland surface waters such as the Los Angeles River.

64. The Basin Plan specifies potential, intermittent, and existing beneficial uses for Los Angeles River Reach 4 including municipal and domestic supply, groundwater recharge, warm freshwater habitat, wildlife habitat, and wetland habitat. Basin Plan, Table 2-1.

65. Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. §1313(d).

66. Reach 3 of the Los Angeles River is impaired for trash, ammonia, nutrients (algae), copper, indicator bacteria, and toxicity.

67. The Receiving Waters are impaired, and Defendant's discharges of pollutants above the WQS contributes to the continued impairment of the receiving water's beneficial uses

68. In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 40 C.F.R. § 131.38. The CTR sets forth lower numeric limits for copper, zinc, and other pollutants; CTR criteria can be as low as, copper (0.013 mg/L) and zinc (0.12 mg/L) in freshwater surface waters with water hardness calculation of 50 mg/L.[3] For saltwater there are lower standards for copper (0.0048 mg/L) and zinc (0.09 mg/L) under the CTR.

69. The CTR includes further numeric criteria set to protect human health and the environment in the State of California. See Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.

---

[3] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit requires permittees to report their sample results as total metal concentrations. (*See* Storm Water Permit, Attachment H at ¶ 18.)

70. Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of the Storm Water Permit's Receiving Water Limitations. See Storm Water Permit, Section VI(A).

71. Without any storm water sampling data from the Facility for over four (4) years, Plaintiff does not have sufficient information to determine the levels of pollution discharged from the Facility in industrial storm water and is unable to assess the contribution of pollutants discharged from the Facility to determine the associated environmental harms to the Receiving Waters.

**D. The Storm Water Permit's Numeric Effluent Limitations**

72. Effective July 1, 2020, the Storm Water Permit establishes numeric effluent limitations ("NELs") for facilities that discharge storm water associated with industrial activities into water bodies that have approved TMDLs set forth in Storm Water Permit, Attachment E. TMDLs in place for pollutants discharged from industrial facilities to the Los Angeles River and its tributaries include nitrogen and metals. Storm Water Permit, Attachment E, Table E-1.

73. Discharges from the Facility are subject to the Los Angeles River and its watershed TMDL requirements, which include the following NELs: nitrate-nitrogen (8.0 mg/L) nitrite-nitrogen (1.0 mg/L), nitrate-nitrogen plus nitrite-nitrogen (8.0 mg/L), ammonia (4.7 mg/L), copper (0.06749 mg/L), lead (0.094 mg/L), cadmium (0.0031 mg/L), and zinc (0.159 mg/L). Storm Water Permit, Attachment E, Table E-2.

74. An exceedance of an NEL constitutes a violation of the General Permit. General Permit, Attachment C at 5. An NEL exceedance occurs when two (2) of more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NEL value listed in Table E-2 of Attachment E to the General Permit. *Id*.

75. A Discharger that is notified by a Regional Board or who determines the discharge is causing or contributing to an exceedance of a water quality standard

must comply with the Water Quality Based Corrective Actions in Section XX.B of the General Permit and report to the Regional Board regarding same. *See* General Permit Section XX.B. A discharger who violates a NEL must also comply with the Water Quality Based Corrective Actions of the Permit. *See* General Permit Sections V(C), VII(A)(1), VII(E) and Attachment E.

76. Based upon Plaintiff's investigation of the Facility and the lack of BMPs meeting the strict BAT/BCT standards under the Storm Water Permit, Plaintiff alleges that pollutant levels in storm water discharged from the Facility likely exceed water quality standards discussed herein.

### E. The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements

77. Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. Storm Water Permit, Sections I(I) (Finding 54) and X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the Facility. Storm Water Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. Storm Water Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. Storm Water Permit, Sections I(D) (Finding 32) and X(C).

78. The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the

BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. Storm Water Permit, Section X. The Facility SWPPP is missing many of the required elements discussed above.

79. The Site Map shall include the following information: the facility boundary; storm water drainage areas within the facility boundary; portions of any drainage area impacted by discharges from surrounding areas and flow direction of each drainage area; on-facility surface water bodies; areas of soil erosion; location(s) of nearby water bodies (such as rivers, lakes, wetlands, etc.); location(s) of municipal storm drain inlets that may receive the facility's industrial storm water discharges and authorized Non-Storm Water Discharges (NSWDs); locations of storm water collection and conveyance systems and associated points of discharge, and direction of flow; any structural control measures (that affect industrial storm water discharges authorized NSWDs, and run-on); all impervious areas of the facility, including paved areas, buildings, covered storage areas, or other roofed structures; locations where materials are directly exposed to precipitation; locations where significant spills or leaks identified have occurred; areas of industrial activity subject to this General Permit; all storage areas and storage tanks; shipping and receiving areas; fueling areas; vehicle and equipment storage/maintenance areas; material handling and processing areas; waste treatment and disposal areas; dust or particulate generating areas; cleaning and material reuse areas; and, any other areas of industrial activity which may have potential pollutant sources. Storm Water Permit, Attachment D. The Facility SWPPP map is missing many of the required elements discussed above.

80. The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section X.

81. The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. Storm Water Permit, Section X(A)-(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. Storm Water Permit, Section X(B) and Section XV.

82. The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. Storm Water Permit, Sections I(J) (Finding 55) and X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via the State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS") within 30 days. Storm Water Permit, Section X(B)(2). Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. Id. at Section X(B)(3); Storm Water Permit, Fact Sheet, Section II(I)(1).

### F. The Storm Water Permit's Monitoring Implementation Program Requirements

83. The Storm Water Permit requires facility operators to develop and implement a Monitoring Implementation Plan ("MIP"). Storm Water Permit, Sections X(I) and XI(A)–(D). The MIP must ensure that storm water discharges comply with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Storm Water Permit. Storm Water Permit, Section XI. The MIP must ensure that practices at the Facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the Facility, including revision of the SWPPP. Id.

84. Further objectives of the MIP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges comply with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Storm Water Permit, Section XI.

85. The MIP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. Id.

86. The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. Storm Water Permit, Sections I(J) (Findings 55–56) and XI.

87. Section XI(A)(4) of the Storm Water Permit requires that the MIP shall be revised as necessary to ensure compliance with the Storm Water Permit.

88. Section XI(A) of the Storm Water Permit requires dischargers to conduct monthly visual observations of storm water discharges.

89. Section XI(A)(2) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water

discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. See Storm Water Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. Storm Water Permit, Section X(B)(1).

90. The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. Storm Water Permit, Section XI(B)(4).

91. Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

92. Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

93. Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, and additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

94. All permitted facilities are required to sample storm water for TSS, O&G, and pH. The Facility's NOI classifies the Facility under Standard Industrial Classification Code ("SIC") Code 2899 - Chemicals and Chemical Preparations, not elsewhere classified. Facilities must also sample and analyze additional parameters

identified on a facility-specific basis to reflect a facility's pollutant source assessment, as required by the Storm Water Permit and the Regional Board, and additional parameters related to receiving waters with 303(d) listed impairments. Storm Water Permit, Section XI(B)(6).

95. Plaintiff is informed and believes, and thereon alleges, the Facility only samples for TSS, O&G, and pH.

96. Section XVI of the Storm Water Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of the permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

**G. Exceedance Response Action Requirements**

97. When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." See 2015 Permit, Section XII(B). A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. See Storm Water Permit, Section XII(C).

98. Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. See Storm Water Permit, Section XII(C). By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the Storm Water Permit. See Storm Water Permit Section XII(C)(1)(a)-(c).

99. Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. See Storm Water Permit, Section XII(C)(1)(c).

100. Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. See Storm Water Permit, Section XII(C)(2)(a)(i)-(ii).

101. The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. See Storm Water Permit, Section XII(C)(2)(a)(iii).

102. A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. See Storm Water Permit, Section XII(C)(2)(b).

103. A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the Discharger is in Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. See Storm Water Permit, Section XII(D).

104. A Discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during which the NAL exceedances occurred. On

January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a Discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. See Storm Water Permit, Section XII(D).

105. Without sufficient sampling data from the Facility, Plaintiff, the State Board, and the Regional Board do not have the required information to determine whether the Facility should be in the ERA program.

## V. STATEMENT OF FACTS

### A. Defendants Facility Site Description, Industrial Activities, and Pollutant Sources

106. Defendants operate a chemical mixing, blending and storage facility in Los Angeles, California, less than one half mile from the Los Angeles River. Industrial activities at the Facility include chemical blending, manufacturing, and bottling, trans-loading, private label production, and hazmat warehousing. Acids, biocides, corrosives, oxidizers, pesticides, powders, silicones, and solvents are stored and used in the industrial manufacturing processes at the Facility. The Sunland Chemical SWPPP, last revised on June 16, 2016 ("Facility SWPPP") is silent as to the Facility operating hours and the SIC Code, though publicly available information notes that the Facility operates Monday through Friday 8:00AM to 4:30 PM, and Saturday 7:00 AM to 3:30 PM, and the Facility NOI states that the Facility operates under SIC Code 2899 - Chemicals and Chemical Preparations, not elsewhere classified.

107. The Facility SWPPP lists the Facility at 60,000 square feet with 99.9% of the Facility impervious. The Sunland Chemical NOI indicates that the Facility size is 20,000 square feet with 2000 square feet of the site exposed to storm water and 0% impervious. The Facility SWPPP describes two (2) storm water outfalls, two (2) outfalls designated for visual monitoring, two (2) outfalls designated for storm water sampling, and that storm water flows west at the Facility.

108. The Facility SWPPP map depicts two (2) buildings with a large yard behind the buildings to the west with one labeled as a warehouse containing an office, a clarifier and shipping prep area, and a lab and the second building to the northwest of the Facility footprint is noted to house a blending and manufacturing area (Blending Area #1), office space, a maintenance workshop, a break room, and a supply room. At least ten (10) storage and blending tanks are in Blending Area #1, with a tote storage area and drum storage racks. The Facility SWPPP map also shows an outdoor yard with an enclosed blending area (Blending Area #2) next to a clarifier and storage area, a truck loading zone behind the warehouse and an oval-shaped driveway in the southern section of the site surrounding a steel fabrication area in the center of the driveway.

109. Pollutants from the industrial areas and associated activities described herein and in Attachment A accumulate at the Facility and eventually discharge into storm water. Pollutants of concern at the Facility include TSS, O&G, pH affecting substances, zinc, nitrate-nitrogen plus nitrite-nitrogen, ammonia, and copper.

110. The Facility SWPPP does not identify drainage areas at the Facility but notes two (2) storm water discharge points, not specifically identified as sampling points; the Facility SWPPP map depicts a storm drain in front of the warehouse building bordering San Fernando Road West, and a second storm drain behind the warehouse building in the yard, and Waterkeeper alleges herein that industrial storm water runoff from the Facility enters those two storm drain and/or municipal storm drains near to the Facility and enters the Los Angeles County Municipal Separate Storm Sewer System (“MS4”) which flows into the Los Angeles River near to the Facility.

111. Percipient witness observations, and publicly available information and imagery evidence insufficient BMPs at the Facility to meet the strict BAT/BCT standards required under the Storm Water Permit with an investigation of the Facility revealing evidence of track out, a lack of secondary containment of chemicals,

industrial materials stored outside, minimal housekeeping, and ample evidence for Plaintiff to allege that pollutants generated at the Facility are eventually exposed to and entrained in storm water and discharged to the Los Angeles River.

112. The Facility discharges industrial storm water into the Los Angeles River which flows downstream to the Los Angeles River Estuary, Queensway Bay, San Pedro Bay, and ultimately into the Pacific Ocean, all waters of the United States within the meaning of the Clean Water Act.

**B. The Los Angeles River**

113. LA Waterkeeper's members utilize the Los Angeles River and downstream water bodies for recreation, scientific study through pollution and habitat monitoring and restoration activities. LA Waterkeeper monitors the water quality, insect populations, and habitat at multiple locations in the Los Angeles River.

114. The Los Angeles River and its estuary provide critical habitat for species, including some that are endangered, threatened, rare, and endemic to Southern California. The concrete-lined sections provide wading habitat for shorebirds that have few other options, given that the majority of Los Angeles' wetlands have been destroyed. The Los Angeles River estuary provides a rich brackish habitat at the intersection of freshwater and saltwater environments. These river reaches support endangered species, including the Least bell's vireo, Western yellow-billed cuckoo, Willow flycatcher, and Tri-colored blackbird. They also support species of special concern, such as the Santa Ana sucker, arroyo chub, California brown pelican, yellow-breasted chat, long-billed curlew, bank swallow, and the California red-legged frog. These habitats remain vulnerable, however. Past habitat destruction and pollution have led to the extirpation of many species, including the western pond turtle and the steelhead trout, and many species listed here are likely to be extirpated in the near future.

115. Queensway Bay is the outlet for the Los Angeles River and its estuary. San Pedro Bay includes the Los Angeles and Long Beach Harbors. The outer part of

the harbors (the greater San Pedro Bay) is open to the Pacific Ocean. The northern portion of San Pedro Bay formerly consisted of marshes and mudflats with a large marshy area. The surrounding area was formerly wetlands but is now heavily developed and contains a marina, restaurants, beaches, and businesses. Ample recreational opportunities exist in and around the bays, including water contact sports such as kayaking, sailing, stand-up paddle boarding, rowing, and jet skiing, and other activities such as walking, bicycling, boating. The bays provide habitat for an abundant variety of aquatic and bird species and other wildlife.

**C. The Facility Storm Water Permit Coverage**

116. SMARTS lists the current WDID number for the Facility as 4 19I000812 and coverage under the Storm Water Permit as "Active".

117. The NOI for the Facility lists the Receiving Water as "Los Angeles River."

118. Plaintiff is informed and believes, and thereon alleges, that Defendants have operated with inadequately developed and implemented SWPPP in violation of Storm Water Permit requirements since at least June 15, 2021. Defendants have failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's unlawful effluent limitation violations.

119. Plaintiff is informed and believes, and thereon alleges, that pollutants associated with the Facility include, but are not limited to: TSS, O&G, pH, zinc, nitrate-nitrogen plus nitrite-nitrogen, ammonia, and copper.

120. Plaintiff is informed and believes, and thereon alleges, that Defendants failed to implement the minimum BMPs required by the Storm Water Permit, including good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. Storm Water Permit, Sections X(H)(1)(a)–(g). The BMPs that are described in the Facility's SWPPP and witnessed by Plaintiff's

representatives do not meet the standards required under the General Permit and are thus likely insufficient to prevent water quality exceedances at the Facility. The lack of adequate BMPs at the Facility are evident and the Facility's SWPPP and Monitoring Implementation Plans require improvement.

121. Plaintiff is informed and believes, and thereon alleges, that the Facility has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations. Storm Water Permit X.H.2. Plaintiff is informed and believes that the most recent BMPs at the Facility are insufficient to prevent Permit violations.

122. Percipient witness investigation and publicly available imagery suggests that any BMPs implemented at the Facility are insufficient to prevent exceedances of NALs and NELs in storm water discharges from the Facility.

123. Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to collect sufficient storm water samples for analyses, in violation of the Storm Water Permit, since at least June 15, 2021.

124. Plaintiff is informed and believes, and thereon alleges, that pollutants, including, but not limited to those referenced herein, have been and continue to be tracked throughout the Facility's operation areas.

125. Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address pollutant sources and pollutants result in the exposure of pollutants associated with its industrial activities to precipitation, which results in discharges of polluted storm water from the Facility into the Receiving Waters in violation of the Storm Water Permit and/or the CWA.

### D. Storm Water Discharges from the Facility

126. As discussed above, pursuant to the Facility SWPPP, there are at least two (2) discharge points at the Facility where storm water leaves the Facility and is discharged into the Los Angeles River.

127. Plaintiff is informed and believes, and thereon alleges, that the Facility has only sampled and analyzed storm water discharge once over the past five (5) reporting years on December 14, 2021, and thus pollutant levels in storm water discharges from the Facility are largely unknown.

### E. The Facility's Storm Water Discharges to the Receiving Waters May Contain Elevated Levels of Pollutants

128. Plaintiff is informed and believes, and thereon alleges, that pollutants from the Facility discharge into the MS4 which flows into the Los Angeles River and downstream to the Los Angeles River Estuary, Queensway Bay, San Pedro Bay, and the Pacific Ocean.

129. Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows into the Receiving Waters.

130. Storm water discharges containing pollutants including, but not limited to, heavy metals such as zinc and copper adversely affect the aquatic environment.

131. Without sufficient sample analysis of storm water discharges from the Facility Waterkeeper, the State Board and Regional Board are unaware if storm water discharged from the Facility contain pollutants in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, Benchmarks, and/or the CTR in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

132. Plaintiff is informed and believes, and thereon alleges, that during and/or after every significant rain event (a rain event of 0.1 inches or more will generally

produce storm water runoff from industrial facilities) at the Facility since June 15, 2021, through the present, Defendants have discharged and continues to discharge storm water from the Facility that may contain concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the technology-based Effluent Limitations, the Benchmarks, CTR, and/or the WQS.

### F. Defendants' Violations of the Storm Water Permit's Sampling, Reporting, and Monitoring Implementation Plan Requirements

133. Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to develop an adequate Monitoring Implementation Plan ("MIP") for industrial operations at the Facility that complies with Section XI of the Storm Water Permit.

134. The Facility SWPPP does not contain a MIP section that conforms to the requirements of Section XI of the Storm Water Permit; and any MIP within the Facility SWPPP should have been further developed to ensure sufficient storm water sampling and sufficient reporting as required under the Storm Water Permit.

135. Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Section XI of the Storm Water Permit.

136. Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to implement the MIP at the Facility, in violation of Section XI of the Storm Water Permit.

137. Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to collect or analyze sufficient storm water samples at the Facility, in violation of Section XI of the Storm Water Permit.

138. Plaintiff is informed and believes, and thereon alleges that over the past five (5) reporting years, the Owners/Operators of the Facility failed to collect the

requisite four (4) storm water samples, collecting and analyzing only a single sample in the 2020-2021 reporting year.

139. Plaintiff is informed and believes, and thereon alleges, that the storm water sampling points at the Facility may not be representative of the pollution levels in storm water discharging from the Facility.

140. Plaintiff is informed and believes, and thereon alleges, that since Defendants have failed and continue to fail to collect sufficient and consistent storm water samples that potential exceedances of NALs and NELs and other water quality standards are unknown and that if Defendants were collecting and analyzing sufficient stormwater samples, there would be documented exceedances reported to the State Board.

141. Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to adequately revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Section XI of the Storm Water Permit.

142. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility consistently fail to prepare, implement, and report as required by the Storm Water Permit.

143. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility consistently submit the Annual Reports for the Facility after the required deadline and after notification from the Regional Board of same.

144. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted.

145. The 2021-2022 Annual Report was submitted late on October 12, 2022, after a past due notice was issued to the Owners/Operators, and claims that monthly

observations and sampling event observations were conducted at the Facility in accordance with the General Permit and that the required number of Qualifying Storm Events during the reporting year for at all discharge locations were collected and analyzed.

146. The 2023-2024 and 2024-2025 Annual Reports were both submitted on August 21, 2025, and contain the same content noting that Facility did not conduct monthly visual observations or sampling event visual observations in violation of Section XI.A.1 and Section XI.A.2 of the General Permit and did not sample the required number of QSE or conduct an annual evaluation in violation of Section XI.B and Section XV of the General Permit.

147. The 2025-2026 Annual Report notes that while no storm water samples were collected and analyzed during the reporting year that after reviewing the current SWPPP and site map, the sampling locations will be adjusted to better represent current industrial activity, and the SWPPP will be updated accordingly but that the number of sample points will not increase or decrease.

148. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to report their non-compliance as required by the Storm Water Permit.

149. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to collect sufficient storm water samples during QSEs.

150. Based on information available to Plaintiff, it is informed and believes, and thereon alleges, that the BMPs proffered as implemented in the Facility SWPPP are insufficient and ineffective in reducing pollutants to levels compliant with the Storm Water Permit and/or the CWA.

151. Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to submit accurate Annual Reports to the Regional Board for the past five (5) reporting years in violation of Section XVI of the Storm Water Permit.

## VI. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollutant Prevention Plan in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

152. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

153. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

154. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement a SWPPP for the Facility, in violation of the Storm Water Permit.

155. Plaintiff is informed and believes, and thereon alleges, that Owners/Operators have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

156. The Owners/Operators have been in violation of the Storm Water Permit at the Facility every day from June 15, 2021, to the present.

157. The Owners'/Operators' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

158. The Owners/Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Owners/Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

159. Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

160. By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from June 15, 2021, to the present, pursuant to

Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

161. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

162. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

163. WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## SECOND CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Plan in Violation of the Storm Water Permit and the Clean Water Act.**

**U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

164. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

165. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

166. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement an MIP for the Facility, in violation of the Storm Water Permit.

167. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately revise an MIP for the Facility, in violation of the Storm Water Permit.

168. The Owners/Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from June 15, 2021, to the present.

169. The Owners'/Operators' violations of its Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

170. The Owners/Operators will continue to be in violation of Section XI of the Storm Water Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an MIP for the Facility.

171. Each and every violation of the Storm Water Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

172. By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from June 15, 2021, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

173. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

174. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

175. WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## THIRD CAUSE OF ACTION

**Defendants' Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

176. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

177. Section XVI of the Storm Water Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. Section XVI of the Permit requires that the Annual Report include a compliance checklist that indicates that a discharger complies with and has addressed all applicable requirements of the Permit, an affirmation of visual observations and sampling results, an identification and explanation of any non-compliance, an identification of all revisions made to the SWPPP within the reporting year, and the date of the Annual Evaluation. Storm Water Permit, Section XVI. Laboratory reports of sample analysis, the annual comprehensive site compliance evaluation report, an explanation of why a permittee did not implement any activities required are also reporting requirements throughout the reporting year and are typically uploaded into the SMARTS portal.

178. The Permit also requires a permittee whose discharges violate the Storm Water Permit's Receiving Water Limitations or water quality standards, such as, NALs, TMDLs, TMDL-Specific Numeric Action Levels to implement additional BMPs or other control measures that are tailored to that facility in order to attain compliance with the receiving water limitation. A Discharger that is notified by a Regional Board or who determines the discharge is causing or contributing to an exceedance of a water quality standard must comply with the Water Quality Based Corrective Actions in Section XX(B) of the Permit and report to the Regional Board regarding same. See Storm Water Permit, Section XX(B).

179. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed to accurately report their non-compliance with the

Storm Water Permit and correctly report storm water sampling analysis compliance in the Facility's Annual Reports. As such, Defendants are in daily violation of the Storm Water Permit.

180. The Facility Owners/Operators have been in violation of Sections XII, XVI and XX of the Storm Water Permit since at least June 15, 2021.

181. The Owners'/Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

182. By committing the acts and omissions alleged above, the Owners/Operators of the Facility are subject to an assessment of civil penalties for each and every violation of the CWA occurring from June 15, 2021, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

183. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

184. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

185. WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## VII. RELIEF REQUESTED

186. Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

**a.** A Court order declaring Defendants to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b) and 1342, for its unlawful discharges of pollutants from the

Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA;

**b.** A Court order enjoining Defendants from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

**c.** A Court order assessing civil monetary penalties for each violation of the CWA occurring on or after November 2, 2015, where penalties are assessed on or after December 27, 2025, of $68,445.00 per day, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

**d.** A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

**e.** Any other relief as this Court may deem appropriate.

DATED: August 18, 2026

Respectfully submitted,

*/s/ Anthony M. Barnes*
Anthony M. Barnes
Kenya R. Rothstein
Attorneys for Plaintiff